UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| BOISE MOBILE EQUIPMENT, INC., an Idaho Corporation,<br><br>Plaintiff,<br><br>v.<br><br>MAZAK OPTONICS CORPORATION, an Illinois Corporation, and GLADWIN MACHINERY AND SUPPLY COMPANY, a Minnesota Corporation,<br><br>Defendants. | Case No. 1:21-cv-00200-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |

## I. INTRODUCTION

This suit involves Plaintiff Boise Mobile Equipment, Inc.'s ("BME") purchase of a $340,000.00 laser cutter, purportedly from Mazak Optonics Corporation ("Mazak") and/or Mazak's sales representative, Gladwin Machinery and Supply Company ("Gladwin"). When the laser failed to ever successfully operate, BME brought claims against Mazak and Gladwin for breach of contract, breach of implied warranty for a particular purpose, fraud in the inducement, unjust enrichment, negligence, and breach of fiduciary duty. Dkt. 15.

There are two competing motions for summary judgment pending before the Court.[1] Dkt. 76; Dkt. 82. After they were fully briefed, the Court held oral argument on the motions on April 8, 2024, and took the matters under advisement. Dkt. 124.

For the reasons set forth below, Mazak's Motion for Summary Judgment (Dkt. 76)

---

[1] Defendant Gladwin also filed a Motion for Summary Judgment; however, Gladwin was dismissed from the case by stipulation and settlement (Dkt. 121; Dkt. 123) making Gladwin's motion moot. Dkt. 122.

is granted in part and denied in part, and BME's Motion for Partial Summary Judgment (Dkt. 82) is denied.

## II. BACKGROUND

BME is an Idaho corporation that manufactures and sells wildland fire trucks to various government agencies. Mazak is an Illinois corporation that manufactures and sells industrial equipment, including laser cutting machines. Former co-defendant Gladwin is a Minnesota corporation doing business throughout the United States and abroad. Gladwin is a third-party seller of industrial equipment and is an authorized sales representative of Mazak products. Because Mazak prefers to service its own products, Mazak services the lasers and other equipment that it builds, and Gladwin sells.

In 2017, BME started looking into whether it should buy an industrial tube laser to streamline its manufacturing process. With that goal in mind, BME's Operations Manager, Var Reeve, went to a manufacturing show in Chicago, Illinois in the fall of 2017. Mazak attends that show annually "to promote and sell new Mazak products." Dkt. 76-2, ¶ 6. Reeve met Doug Young—Mazak's Regional Manager—at the Chicago manufacturing show, where Young and his team were showcasing Mazak's new Versatile Compact Laser Tube 100 ("VCL-T100"). Based on Young's representations and recommendations, BME ultimately purchased a VCL-T100 from Mazak. As part of the deal, BME made a down payment of $42,100.00.

BME alleges that, in late 2017 or early 2018, Reeve heard complaints about the VCL-T100, and expressed concerns to Young that the VCL-T100 was not fit for BME's needs. Mazak instead suggests Reeve only told Young that BME was experiencing cash

flow problems and could not afford the VCL-T100. In or about January 2018, BME asked Mazak to cancel BME's VCL-T100 order and requested a refund of its down payment. Mazak responded that the down payment was non-refundable,[2] but offered to return a portion of BME's down payment and apply the rest of the payment to BME's future purchase of a laser. BME contends Mazak offered to apply the rest of BME's payment to BME's future purchase of a laser from Mazak, while Mazak maintains it offered to apply the money to BME's future purchase of a Mazak laser.

BME and Mazak engaged in further negotiations regarding the VCL-T100, and, on July 24, 2018, Mazak's financing manager, Ximena Burton, offered BME several financing plan options. However, on September 13, 2018, Young sent BME's President, Chad Moffatt, an email explaining the VCL-T100 had been sold, but Mazak's President, Al Bohlen, would honor the pricing Mazak gave BME for a new machine instead of a showroom machine. BME again requested return of its $42,100.00 down payment, and Mazak again declined to refund it.

In the fall of 2018, Young visited BME's location in Idaho. Reeve gave Young a tour of BME's manufacturing facility and explained what BME needed out of a laser cutting machine. BME suggests that in the meantime, and unbeknownst to BME, Mazak and Gladwin were working together to save Mazak's multi-million-dollar sale of a custom-designed automated laser system to a third-party, HitchDoc ("HD"). BME alleges that in order to save the sale to HD, and as a pre-condition to the HD sale, HD demanded Gladwin

---

[2] Mazak's Terms and Conditions required a non-refundable 10% deposit. Dkt. 79-7, ¶¶ 13–14.

and Mazak sell HD's used industrial tube laser—a Mazak Fabrigear 150 ("FG-150").

In the face of such pressure, Bohlen, Reeve, and Gladwin's founder and general manager, Matt Francis, purportedly began working together to save the multi-million-dollar deal by convincing BME to purchase HD's used FG-150. Mazak maintains the HD sale was finalized by September 2018, and therefore occurred before the used FG-150 transaction was even contemplated. Mazak also suggests it did not take part in any aspect of selling the FG-150 to BME. Yet, a January 30, 2019 email from Young to Bohlen suggests Mazak set the terms of the sale of the FG-150 to BME. Dkt. 116, Ex. A at 12. Specifically, Young outlined what he believed the sale of the FG-150 to BME "should look like," and suggested a purchase price of $340,000.00, reduced to $297,900.00 after applying BME's $42,100.00 down payment to Mazak for the VCL-T100 to BME's purchase of the FG-150. *Id*. Young asked Bohlen to confirm he agreed with such terms so Young could respond to Francis. *Id*. Thus, it appears Mazak, and not Gladwin, set the price for BME's purchase of the FG-150.

Further, during his deposition, Francis testified the purpose of the sale of HD's FG-150 to BME was to ensure Mazak's sale of the custom laser to HD went through. Dkt. 116, Ex. E at 93:10–21.[3] Similarly, on November 20, 2018, HD's President, Brad Mohns, expressed frustration with Mazak in an email to Francis, and emphasized when HD agreed to purchase the new laser, "it was very clear to Mazak that they would get the FG sold for this deal." Dkt. 116, Ex. D at 46. Mohns later refused to install the new custom laser until

---

[3] Citations, like this one, to deposition transcripts are to the transcript's page and line numbers. All other page citations are to the CM/ECF-generated page number.

the FG-150 was sold and removed from HD's facility. *Id*., Ex. E at 40:8–13, Ex. C at 55:20–24. Further, a January 27, 2019 email between Francis and Bohlen suggested Francis was under the impression that Mazak—and not Gladwin—sold the used FG-150 to BME. Dkt. 116, Ex. B at 16 ("I spoke to brad today. I told him that mazak went to bat and sold the fg and mazak will decom and reinstall and finance. He asked if I could sell it separate I said . . . . I cant [sic] sell the fg without Mazak!!").

Despite Mohns and Francis's seemingly shared belief that HD required Mazak to sell the FG-150 as a condition to HD moving forward with the purchase and installation of the new multi-million dollar laser, Mazak  maintains: (1) HD never required Mazak to sell the used FG-150; (2) Gladwin was the only entity that made a commitment to HD to sell the used FG-150; (3) HD therefore only pressured Gladwin to complete the sale; and (4) Young informed Reeve that the used FG-150 was owned by Gladwin's customer, and not by Mazak. Dkt. 93, at 5. Even if the Court were to disregard the conflicting evidence discussed above and accept Mazak's contentions, it is undisputed that the facts or even the existence of this larger HD sale were never made known to BME prior to discovery in this lawsuit.

In January 2019, Young called Reeve and pitched the idea of BME buying the used FG-150 that Bohlen had allegedly "found" for BME.[4] During their conversations, BME alleges Young told Reeve the price of the FG-150 would be the same as BME's last deal with Mazak for the purchase of the VC1-T100—except the FG-150 would be swapped

---

[4] Mazak contends BME has misrepresented the January 2019 conversation between Young and Reeve, and maintains Young never suggested Bohlen "found" the used FG-150 for BME. Dkt. 93, at 5

in—and Mazak would apply BME's down payment for the VCL-T100 to BME's purchase of the FG-150. Dkt. 82-9, ¶ 24. Young also purportedly represented that while the FG-150 was used, it had new components, so it was like the "guts of the laser were brand new." *Id*., ¶ 22. BME suggests Young made multiple additional representations about the FG-150, including that it was a "workhorse," the best machine in the company, "bulletproof," capable of running 365-days a year, and would not give BME any problems. *Id*., ¶ 23. Young also represented that by purchasing the FG-150, BME would be backed by Mazak's large service network. *Id*.

While Mazak does not dispute that Young offered to apply BME's down payment for the VCL-T100 to BME's purchase of the FG-150, it contends BME's characterization of each of Young's other alleged statements either misstates Young's testimony or is wholly inaccurate and unsupported. Dkt. 93, at 2. Although BME submitted declarations from Moffatt and Reeve to verify Young's statements, Mazak objects that such declarations contain inadmissible hearsay the Court cannot consider on summary judgment. *Compare* Dkts. 82-4, 82-6 *with* Dkt. 93, at 2.

On January 23, 2019, Young sent Reeve an email with the specifications for the FG-150. Dkt. 79-16. Young's email stated the selling price would be $340,000.00, but would include Mazak preparing the FG-150 for shipment, and doing the reinstallation of the FG-150, and training of BME's employees on how to use the FG-150, at BME's facility. *Id*. Young also told Reeve to call Francis "to arrange a trip to see the machine." *Id*.   Francis later answered Reeve's questions about the FG-150 and said it was in very good condition and confirmed HD had been diligent about maintenance. Dkt. 82-9, ¶ 28.

MEMORANDUM DECISION AND ORDER - 6

BME alleges that while Reeve was doing his due diligence on the FG-150, Young and Francis called and pressured him to buy the FG-150 before competing buyers did. *Id.*, ¶ 29. Mazak suggests this allegation is "wholly inaccurate and unsupported," but does not further elaborate. Dkt. 93, at 2. During a later call with BME, Young purportedly reiterated: (1) the FG-150 would provide BME with the same benefits as the VCL-T100; (2) the FG-150 was the exact product BME needed; (3) the FG-150 was a "tank"; (4) the FG-150 would be able to do anything and everything BME needed even though the FG-150 was used; (5) BME would not have any issues with the FG-150; (6) the FG-150 was up and running; and (7) the FG-150 would last for a long time. Dkt. 82-9, ¶¶ 47–53. Mazak again contends BME has misstated Young's testimony and/or that BME's allegations are wholly inaccurate and unsupported. Dkt. 93, at 2. In addition, while BME alleges that neither Young—nor anyone else at Mazak—told BME that Mazak was not the seller of the FG-150, Mazak maintains BME was repeatedly informed Gladwin was the seller. As a result of Young's representations, BME suggests Reeve recommended purchasing the FG-150 to Moffatt, and Moffatt also ultimately decided to purchase the FG-150 based on Young's representations.  Again, Mazak disputes that Young made such representations about the FG-150.

As noted, as part of the final deal, Mazak agreed to: (1) apply BME's down payment for the VCL-T100 to BME's purchase of the FG-150; (2) decommission the FG-150 at HD's facility in Minnesota; (3) recommission the FG-150 at BME's factory in Boise; and (4) train BME's employees on how to use the laser. Dkt. 79-16. Mazak does not dispute it made such promises, but somewhat disingenuously argues it never agreed to "successfully

recommission" the FG-150. Dkt. 90, at 10.

During the conversations that followed the negotiations, Moffatt only spoke to, and negotiated with, Young and Ximena Burton, Mazak's Finance Manager. While Mazak does not dispute that Moffatt only spoke to Young and Burton, it suggests Burton is not Mazak's employee. However, in a statement of stipulated facts the parties previously submitted to the Court, Mazak stipulated that Burton *is* Mazak's financing manager.[5] Dkt. 40, ¶ 13.

Allegedly without BME's knowledge, Mazak arranged to process the sale of the FG-150 through Gladwin, rather than through Mazak. Francis described the arrangement as "a transaction that was—the terms were dictated by Mazak and [Mazak] asked us to do the paperwork, so we did the paperwork. . . . we didn't have a lot of control of any of the terms and conditions of it[.]" Dkt. 116, Ex. E at 95:12–17. However, Mazak maintains BME knew Gladwin was selling the FG-150 and BME has mischaracterized Francis's testimony.

On January 25, 2019, Burton advised BME that financing had been approved for BME's purchase. She also sent Moffatt a "Financing Term Sheet" which contained the terms for the sale and financing of BME's purchase. Dkt. 82-9, ¶ 36. Mazak suggests the

---

[5] This case was reassigned to Visiting Judge Sam E. Haddon on September 27, 2021. Dkt. 23. In preparation for an early preliminary pretrial conference, Judge Haddon ordered the parties to together submit, *inter alia*, "a brief factual outline of the case" and "the factual basis of each claim or defense advanced" by each party. Dkt. 34. The parties filed a Statement of Stipulated Facts on November 19, 2021. Dkt. 40. The Statement was signed by counsel for both BME and Mazak, and stated, in relevant part: "On July 24, 2018, *Mazak's financing manager, Ximena Burton*, offered BME several financing plan options." *Id.*, ¶ 13 (emphasis added). The case was subsequently reassigned to this Court on August 17, 2023, when Judge Haddon took inactive status. Dkt. 73.

Financing Term Sheet "is not a Mazak form," and, as noted, maintains Burton is "not a Mazak employee," despite previously stipulating that Burton is Mazak's financing manager. *Compare* Dkt. 40, ¶ 13 *with* Dkt. 93, at 6.

On January 28, 2019, Moffatt signed and returned the Financing Term Sheet to Burton. On January 30, 2019, Moffatt sent Burton a Purchase Order ("PO")  made out to Mazak for both the FG-150 and for Mazak's additional services. Dkt. 82-4, ¶ 48. Burton responded and instructed the PO "should be to Gladwin. Also the seller is Gladwin in the Mfg Sales Tax Exemption. Once corrected please send us a copy." Dkt. 82-9, ¶ 38.

BME contends at the time it received the latter communication, neither Burton nor anyone else at Mazak explained: (1) what the relationship between Mazak and Gladwin was; (2) by following Burton's instructions, BME would be entering into a contract with Gladwin instead of Mazak; or (3) Mazak merely facilitated a deal that was exclusively between Gladwin and BME. BME maintains Moffatt complied with Burton's request while still believing BME's agreement was with Mazak. Although Mazak argues BME was clearly aware Gladwin was selling the FG-150 because there is no dispute that the only two parties identified on the PO are BME and Gladwin (Dkt. 90, at 6–7), BME suggests the contract included not only the PO, but also the verbal promises made by Young and terms—such as Mazak's agreement to decommission and recommission the machine and train BME's employees—which were not included in the PO. Dkt. 103-1; Dkt. 79-17.

 In addition to the fact that only Gladwin was identified as the seller on the PO and other purchase documents Mazak highlights that "Young never sent BME a contract for the sale of the [FG-150]." Dkt. 76-2, ¶¶ 34, 53, 55, 58–60. However, it appears the

transaction was not as clear-cut as Mazak suggests. For instance, during discovery, Gladwin produced an email Francis sent to one of Mazak's financing managers, Sherry Liu, regarding BME's purchase of the FG-150. In that email, Francis explained:

> Originally Mazak had an order for a new VCL laser from [BME]. Mazak had received a down payment directly from [BME] for . . . $42,100.
>
> To complete a new sale, [HD] had to move a used FG-150 that Gladwin had been trying to sell for some time.
>
> [BME] was Mazak's customer, not Gladwin's. *We did not sell them the machine, Mazak did.* Because it was used, to get the new deal done, Mazak asked Gladwin to invoice the customer and collect the money. Mazak priced it at $340,000. . . . We did not represent, guaranty, *nor were we involved in the actual sale of the used machine* to [BME] This was all handled directly by Mazak[.]

Dkt. 117, Ex. M at 27–28 (emphasis added).

In the aforementioned email, Francis also asked Liu to send him a corrected invoice so that Gladwin *could pay Mazak* the difference between what BME paid to Gladwin, and what Gladwin then transferred to HD as a result of BME's purchase of HD's used FG-150. *Id*. Liu sent Francis's email to Bohlen and asked him to verify the information Francis had provided so Lui could invoice Gladwin. *Id*. Bohlen responded: "Agreed, please invoice accordingly." *Id*. Thus, it appears that both Gladwin's founder, and Mazak's President, admitted Mazak—and not Gladwin—sold BME the FG-150.[6] Further, it appears Gladwin transferred the overage between what BME paid for the machine, and what was paid to HD for the sale of HD's used FG-150, to Mazak.

---

[6] To further illustrate Mazak sold the FG-150, BME notes Mazak also later paid Young a commission for selling the FG-150 to BME. Mazak responds that Young was paid a commission because the FG-150 was sold in his region, and not because he sold the FG-150 to BME. Regardless of the commission issue, it is clearly disputed whether Mazak, Gladwin, or both sold the FG-150 to BME.

MEMORANDUM DECISION AND ORDER - 10

To explain the aforementioned email, Mazak highlights Francis repeatedly testified during his deposition that Gladwin was responsible for selling the FG-150 to BME. Dkt. 100, at 3. Mazak also notes Francis explained during his deposition that another Gladwin employee actually wrote the email, which he simply forwarded to Liu. *Id*. The Gladwin employee who wrote the email—which Francis then forwarded to Liu—was Francis's partner and Gladwin's president, Todd King. Thus, in 2019 when the sale of the FG-150 was made and the email was forwarded, it appears both King and Francis were under the impression that Mazak, and not Gladwin, sold the FG-150 to BME. Dkt. 117, Ex. M at 27–28. Moreover, even if King wrote the email, Mazak does not dispute that Bohlen agreed such facts were accurate when Liu asked him to verify them. Dkt. 117, Ex. M at 27–28.

After the sale, BME relied upon Mazak to decommission the FG-150 from HD's facility and recommission it at BME's facility. BME explains—and Mazak does not dispute—that properly decommissioning and recommissioning an FG-150 involves, among other things: (1) disassembling the FG-150 down to its sub-components; (2) organizing, storing, and otherwise preparing the disassembled pieces for shipping; (3) winterizing the FG-150; and (4) reassembling the FG-150 and putting it back into its normal operating condition.

BME contends Mazak gave the decommissioning and recommissioning project to a single field engineer named Dan Brennan who had not been trained to, and had not previously accomplished, a similar project of his own. Brennan purportedly rushed decommissioning the FG-150 from HD's facility, and completed the job in just over half the time it should have taken with a more experienced technician. Brennan failed to create

an inventory or list of parts as he decommissioned the FG-150, and instead took before and after pictures so he could later attempt to reverse engineer his process when putting the machine back together in Boise. However, Brennan then accidentally ran over his phone, losing all of the pictures upon which he planned to rely when recommissioning the FG-150. Although BME cites Brennan's deposition testimony in support of the aforementioned facts, Mazak suggests, without further clarifying, that BME has misstated Brennan's testimony. *Compare* Dkt. 82-9, ¶¶ 44–46 *with* Dkt. 93, at 6–7.

BME alleges Brennan also failed to ensure the decommissioned parts of the FG-150 were properly contained, loaded, and stored before they were transported, and that even at this early stage of the process, many of FG-150's components showed visible signs of damage or neglect. This included, but was not limited to, numerous sensors and cables that looked smashed, broken connectors, broken pistons in the lifting arms, broken brackets, places where it looked like the machine was missing pieces, and pieces that looked like they had been bolted to the FG-150 and then welded over. Parts of the machine were also covered in oil, grease, and accumulated industrial byproduct. In addition, a number of the FG-150's parts were allegedly lost in transit but, because he did not have an inventory, Brennan could not determine what pieces were missing. BME suggests Brennan even failed to notice that an entire truckload of parts had not been delivered. Among the missing parts was one of the FG-150's support arms, which helps to support and secure whatever material the FG-150 is cutting while the laser does its work.

Mazak counters that pursuant to the terms of the Order Confirmation, BME was responsible for all freight, rigging, electrical, and air connections, and BME has thus

attempted to shift blame to Brennan for issues that can only be attributed to BME. Mazak does not further explain how BME was responsible for the parts of the FG-150 which were purportedly missing, damaged, or broken as a result of Brennan's alleged failure to ensure the parts of the machine were properly decommissioned and stored before they were transported.

BME alleges Brennan struggled to recommission the FG-150, and frequently stopped working to call for help or to research what he was supposed to be doing. Brennan testified that not having the pictures on his phone created a "pretty significant problem" that made recommissioning the FG-150 "much more difficult." Dkt. 116, Ex. F at 147:9–12. When Brennan informed Michael Chase, the Manager of Mazak's Customer Service Department and his supervisor at Mazak, about losing the photographs on his phone, neither Chase nor Mazak offered Brennan any additional assistance. Mazak also denied Brennan's request for help from another service technician, effectively telling him he would just have to "keep plugging away at it." *Id*. at 131:6–10.

After Brennan's sixth week of attempting to recommission the FG-150, Mazak reassigned the project to another technician, Tony Bell. Upon arriving at BME's facility, Bell noticed Brennan had left significant sections of the FG-150 outside and exposed to the elements. During his deposition, Bell explained that a good engineer would have known the parts should not be left outside, and that BME brought the parts inside once he arrived at BME's facility and told them to do so. Dkt. 116, Ex. G at 64:5–67:1. However, in his subsequent declaration, Bell later suggested BME left the parts outside. Dkt. 90-3, ¶ 7. Bell's deposition testimony suggests he did not know whether Brennan or BME left the

parts outside, but that Brennan should have known better than to allow the parts to remain outside. Dkt. 116, Ex. G at 64:19–65:13. Further, Brennan confirmed during his deposition that he knew the FG-150 was "not suitable for outdoor use or storage long term." Dkt. 116, Ex. F at 71:13–16.

When Mazak later terminated Brennan, Chase sent Bohlen an email explaining Brennan's performance at BME was one of the direct reasons he was terminated. Dkt. 82-9, ¶ 59. Similarly, on October 1, 2019, Chase admitted Brennan had many shortcomings, and had made several "miss-steps" that were preventing the successful recommission of the FG-150. *Id*., ¶ 60. In an October 9, 2019 email to Bohlen, Francis lamented, "I do not understand how this mess happened—I have been involved in many of these FG150 decom/recom's and I don't know how we could have had such a catastrophic outcome unless something went wrong with how the technician took it apart or put it back together." Dkt. 116, Ex. A at 14.

Once he arrived and inspected the FG-150, Bell purportedly told Greg Monsour, the head of BME's laser department, that the FG-150 needed a complete ground-up rebuild, and that it did not look like the machine BME had been promised. Dkt. 82-9, ¶ 61. BME suggests there were problems with the FG-150's touch-probe, many of the FG-150's eye sensors, the pipe position sensor, and multiple broken and/or damaged connectors, cut wires, rollers, pins and bearings. In addition, the FG-150's safety features appeared to have been intentionally tampered with and disabled. The FG-150 also began displaying a "950 error code" which indicated there had been a fatal hard drive crash. BME later learned this was the same error code that was displayed at HD prior to the sale, and of which BME was

allegedly not given any notice. Mazak counters that Reeve received the maintenance records for the FG-150 from HD, and should have noticed the "950 error code" referenced therein.

After additional issues were discovered, Garrett Peterson, the Mazak employee responsible for training BME's employees, was eventually able to use the FG-150 to make test cuts on some bustle tubes. Several days later, after Peterson had finished his final training session and left BME's facility, such pieces were rejected by BME's Quality Assurance team because none of the pieces that Peterson cut were within tolerance, and, as such, could not fit on BME's fire trucks. BME maintains the FG-150 never managed to cut any parts that were usable or that were put into production without first needing corrective work.

During the next few weeks, BME continued to discover new problems and signs the FG-150 was damaged, including the fact that the machine continued to repeatedly crash and display the error 950 code. Such issues continued until the FG-150 finally and fatally crashed on March 23, 2020. Mazak suggests it told BME it would need to purchase a new hard drive, and even offered to install a new hard drive, but BME stated it would not pay for a new hard drive. By contrast, BME maintains Mazak's willingness to help decreased over time, and that Mazak eventually refused to assist BME altogether. Mazak argues the declarations of BME employees cited in support of the latter contentions are inaccurate and inadmissible.

At a minimum, this recitation of facts demonstrates there are numerous genuine issues as to disputed material facts which preclude summary judgment on BME's contract

and fraud claims.

### III. LEGAL STANDARD

A principal purpose of summary judgment is to isolate and dispose of factually unsupported claims. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24 (1986). As such, it is not a disfavored procedural shortcut, but rather the principal tool by which factually unsupported claims can be isolated and prevented from going to trial with the attendant unwarranted consumption of resources. *Id.* at 327.

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court's role at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Zetwick v. Cnty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) (cleaned up). In considering a motion for summary judgment, the Court must "view[] the facts in the non-moving party's favor." *Id.* To defeat a motion for summary judgment, the respondent need only present evidence upon which "a reasonable juror drawing all inferences in favor of the respondent could return a verdict in [his or her] favor." *Id.* (cleaned up). On the other hand, to succeed on a motion for summary judgment, the moving party must either (1) "produce evidence negating an essential element of the nonmoving party's claim or defense," or (2) "show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

The Court must enter summary judgment if a party "fails to make a showing

sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The respondent cannot simply rely on an unsworn affidavit or the pleadings to defeat a motion for summary judgment; rather, the respondent must set forth the "specific facts," supported by evidence, with "reasonable particularity" that precludes summary judgment. *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001).

When considering cross-motions for summary judgment, a court reviews each separately, giving the non-movant for each motion the benefit of all reasonable inferences. *Flores v. City of San Gabriel,* 824 F.3d 890, 897 (9th 2016). The filing of cross-motions does not ensure that summary judgment is appropriate. Instead, the Court has a responsibility to analyze whether the record on cross-motions for summary judgment demonstrates the existence of genuine issues of material fact, even in cases in which both parties believe that there are no material factual issues. *Chevron USA, Inc. v. Cayetano*, 224 F.3d 1030, 1037 & n.5 (9th Cir. 2000).

## IV. DISCUSSION

BME's Amended Complaint contains six claims for relief: (1) Breach of Contract; (2) Breach of Implied Warranty for a Particular Purpose; (3) Fraud in the Inducement; (4) Unjust Enrichment; (5) Negligence; and (6) Breach of Fiduciary Duty.[7] Dkt. 15. Mazak

---

[7] During oral argument, there was some discussion as to whether BME's Amended Complaint contained a breach of express warranty claim for relief. BME devotes much of its Motion for Partial Summary Judgment to Mazak's alleged breach of various express warranties. *See generally*, Dkt. 82-1, Dkt. 103-1. The Court has reviewed BME's Amended Complaint and there is no claim for breach of express warranty in this lawsuit. Dkt. 15. In addition, in its response to Mazak's Motion for Summary Judgment, BME suggested

(Continued)

seeks summary judgment on all six of BME's claims. BME moves for summary judgment on only its contract and breach of implied warranty causes of action. Both summary judgment motions were filed on the same day.

Before considering the parties' motions, the Court briefly addresses Mazak's repeated contention that the declarations of BME's employees cannot be considered on summary judgment because they contain inadmissible hearsay. The Court disagrees.

First, much of the evidence supporting BME's claims is within the declarant or deponent's personal knowledge. Rule 56(e) allows the Court to infer that BME's declarants—including Moffatt, Reeve, and Monsour—have personal knowledge and competence to testify about the matters outlined in their declarations. *Barthelemy v. Air Lines Pilots Ass'n*, 897 F.2d 999, 1018 (9th Cir. 1990). The Court can make such inferences due to such witnesses' positions with BME and their participation in the matters to which they swore. *Id*.

Second, admissions by a party-opponent, such as Bell's alleged statements to Monsour regarding the FG-150 not looking like "the machine BME was supposed to have received," and needing "a complete ground-up rebuild," appear to constitute admissions by a party opponent which do not constitute hearsay under Federal Rule of Evidence 801(d)(2)(D). Dkt. 82-9, ¶ 61.

---

"[i]f Mazak's contract with BME is limited to the services that it agreed to provide and not the sale of the FG-150, then there is no implied warranty under the UCC. Instead, there would be an implied warranty of workmanship." Dkt. 97, at 10. However, BME did not plead a breach of implied warranty of workmanship claim in its Amended Complaint. Dkt. 15. On summary judgment, the Court addresses only the specific claims asserted in BME's Amended Complaint. *Esser Elec. v. Lost River Ballistics Techs., Inc*., 188 P.3d 854, 861 (Idaho 2008) ("The trial court must examine the pleadings to determine what issues are raised in the case. The only issues considered on summary judgment are those raised by the pleadings.").

Third, "even declarations that do contain hearsay are admissible for summary judgment purposes if they 'could be presented in an admissible form at trial.'" *Fonseca v. Sysco Food Servs. of Arizona, Inc*., 374 F.3d 840, 846 (9th Cir. 2004) (quoting *Fraser v. Goodale*, 342 F.3d 1032, 1037 (9th Cir. 2003)). Because the information contained in BME's various declarations could be presented in an admissible form at trial—such as through the declarant's testimony or, in some cases, on cross-examination—the Court may consider it on summary judgment. *Fraser*, 342 F.3d at 1047.

Fourth, and finally, although Mazak repeatedly broadly objects to the evidence BME cites as "hearsay," "inadmissible," "inaccurate," "unsupported by the record," or "misstating witness testimony," it generally fails to explain how or why such objections are applicable, or, in most cases, to even point the Court to the specific contentions to which it objects. *See generally*, Dkt. 93. In the absence of such information, the Court declines to further address Mazak's boilerplate objections on summary judgment.

Having determined the scope of evidence it may consider, the Court first assesses BME's claims upon which only Mazak seeks summary judgment, and then turns to the parties' opposing arguments with respect to BME's claims for breach of contract and breach of implied warranty.

### A. Breach of Fiduciary Duty

Mazak seeks summary judgment on BME's breach of fiduciary duty claim because Mazak did not have a fiduciary relationship with BME. BME failed to respond to this argument in its Response Memorandum. *See generally*, Dkt. 97. At oral argument, Mazak brought up the lack of response from BME on this claim and BME still did not respond.

MEMORANDUM DECISION AND ORDER - 19

As a matter of law, BME's breach of fiduciary duty claim is deemed waived. *Shakur v. Schriro,* 514 F.3d 878, 892 (9th Cir. 2009) (holding plaintiff abandoned its "claims by not raising them in opposition to [the defendant's] motion for summary judgment."); *Zink v. St. Luke's Health System, Ltd.,* 2023 WL 5748158, at *3 (D. Idaho Sept. 6, 2023) ("[A] court may infer from a party's partial opposition that the claims the party does not defend are abandoned."); *Harter v. Bonner Cnty.*, 2018 WL 4775369, at *10 (D. Idaho Oct. 2, 2018).

The Court accordingly GRANTS Mazak's Motion for Summary Judgment with respect to BME's breach of fiduciary claim.

### B. Negligence

Under the economic loss rule, Idaho law bars a negligence claim when there is no personal injury or damage to property other than the defective product that is the subject of the transaction. Because there is no duty to prevent economic loss to another, purely economic losses are not recoverable in tort. *Bhlad v. Richard B. Smith, Inc*., 108 P.3d 996, 100 (Idaho 2005); *Brian & Christie, Inc. v. Leishman Elec., Inc.*, 244 P.3d 166, 172 (Idaho 2010); *Clark v. Int'l Harvester Co.*, 581 P.2d 784 (Idaho 1978) (denying the recovery of economic losses sustained by a plaintiff who claimed a tractor was negligently manufactured); *see also Myers v. A.O. Smith Harvestore Prods., Inc.*, 757 P.2d 695, 698 (Id. Ct. App. 1988) ("The law of negligence and strict liability imposes no liability on the seller of product for defects which cause purely economic losses.").

The economic loss rule is a doctrine of judicial construct that acts as a boundary between tort and contract law. *BrunoBuilt, Inc. v. Briggs Engineering, Inc.,* 525 P.3d 1122,

1128 (Idaho 2023). Economic loss includes costs of repair and replacement of defective property which is the subject of the transaction, as well as commercial loss for inadequate value and consequent loss of profits or use. *Salmon Rivers Sportsman Camps, Inc. v. Cessna Aircraft Co.*, 544 P.2d 306, 309 (Idaho 1975). Idaho recognizes two exceptions to the economic loss rule. The first is where a special relationship exists. *Nelson v. Anderson Lumber Co.,* 99 P.3d 1092, 1100 (Id. Ct. App.  2004). The second is the occurrence of a unique circumstance requiring a different allocation of risk. *Id*.

Mazak argues it is entitled to summary judgment on BME's negligence claim because BME seeks to recover only the economic damages it incurred as a result of purchasing the FG-150. BME counters that this case falls within the special relationship exception to the economic loss rule, which precludes summary judgment on its negligence claim. The special relationship exception to the economic loss rule generally pertains to claims for personal services provided by professionals, such as physicians, attorneys, architects, engineers, and insurance agents. *Id.* This special relationship may exist where a party holds itself out to the public as performing a specialized function and thereby induces reliance on its superior knowledge and skill. *Id.* However, the special relationship exception is extremely narrow and applies in only very limited circumstances. *Aardema v. U.S. Dairy Systems, Inc.,* 215 P.3d 505, 512 (Idaho 2009).

BME argues the special relationship exception is applicable because Mazak had "special expertise regarding a specialized function of disassembling and decommissioning Mazak's FG-150 laser and being able to properly recommission or reinstall it[.]" Dkt. 97, at 21. Although Mazak agreed to decommission and recommission the machine, such facts

do not create a special relationship because BME does not cite any evidence to suggest Mazak either held itself out to the public as having specialized expertise in decommissioning or recommissioning its lasers,[8] or that Mazak performed any personal services. *Mountain View Hosp., L.L.C. v. Sahara, Inc*., 2011 WL 4962183, at *13 (D. Idaho Oct. 17, 2011) ("The Idaho Supreme Court has applied the special relationship exception in only two situations: where the defendant is a professional or quasi-professional performing personal services," or where the defendant held itself out to the public as having expertise in a specialized function.) (citations omitted); *Duffin v. Idaho Crop Imp. Ass'n*, 895 P.2d 1195, 1201 (Idaho 1995) (explaining a special relationship may exist where a party holds itself out to the public as performing a specialized function and induces reliance on its superior knowledge and skill).

BME suggests a special relationship was created because Francis testified that he could not sell and decommission or recommission the FG-150 without Mazak's technical expertise. Dkt. 97, at 21. Given such testimony, BME argues "[a]s in the *Duffin* case where the Idaho Crop Improvement Association (ICIA) was the only entity that could certify seed potatoes, here Mazak was the only entity that could decommission and recommission its laser." *Id*. However, Francis testified that he could not sell, decommission, or recommission the FG-150 without Mazak's expertise because—*at the time the FG-150 was sold to BME*—Francis and Gladwin did not have the "technical expertise that we have now." Dkt. 116, Ex. E at 64:12–15. That Francis and/or Gladwin could not decommission

---

[8] BME has not suggested Mazak held itself out to the public as having *any* specialized expertise. *See generally*, Dkt. 97.

and recommission the FG-150 without Mazak at one point in time, and before Gladwin
later gained the technical expertise to do so, is a far cry from the specialized service at issue
in *Duffin,* where, among other things, the ICIA was the *only* entity in Idaho which could
certify seed potatoes. 895 P.2d at 1201 (finding the ICIA occupied a special relationship
with those whose reliance it had knowingly induced because the ICIA was "the only entity
which can certify seed potatoes in the state of Idaho," knew that seed was sold at a higher
price because it was certified by ICIA, and engaged in a marketing campaign for the very
purpose of inducing reliance because the seed had been certified by the ICIA).

In short, BME has neither provided evidence to suggest, nor cited relevant caselaw
to support, applying the special relationship exception to the economic loss rule in this
case.

In addition, although BME identifies the "unique circumstances" exception to the
economic loss rule in its response brief, it does not identify any unique circumstances
which would warrant applying the exception in this case. Dkt. 97, at 20–21. And although
Idaho recognizes this exception, it has never applied it. *Millenkamp v. Davisco Foods
Intern., Inc.,* 391 F. Supp. 2d 872, 879 (D. Idaho 2005).[9] In the absence of any argument
or caselaw to support applying the unique circumstances exception to the economic loss
rule to BME's negligence claim, the Court declines to further address it.

Finally, BME argues the economic loss rule is inapplicable if either the Court or the

---

[9] Although *Millenkamp* is a 2005 case, BME has not cited, and the Court has not located, any
subsequent case where the unique circumstances exception to the economic loss rule was applied
by Idaho courts.

MEMORANDUM DECISION AND ORDER - 23

jury determines Mazak did not have a contract with BME. Dkt. 97, at 20. However, the economic loss rule precludes recovery of economic losses in negligence cases in general, and not merely when contract claims are also asserted. *Safeco Ins. Co. of Ill. v. LSP Prods. Grp., Inc.*, 619 F. Supp. 3d 1064, 1067 (D. Idaho 2022) (citing *Blahd v. Richard B. Smith*, 108 P.3d 996, 1000 (Idaho 2004)); *see also Duffin v. Idaho Crop Imp. Ass'n*, 895 P.2d 1195, 1200 (Idaho 1995) (concluding that absent an exception to the economic loss rule, Idaho cases present "a general rule prohibiting the recovery of purely economic losses in *all* negligence actions") (emphasis added). Thus, even if a jury determines BME did not have a contract with Mazak, BME's negligence claim fails on summary judgment because BME seeks only economic losses and an exception to the economic loss rule does not apply. Mazak's Motion for Summary Judgment is accordingly granted with respect to BME's negligence claim.

### C. Fraud

To establish fraud or misrepresentation, a party must prove the following elements: (1) a statement or representation of fact; (2) its falsity; (3) its materiality; (4) the speaker's knowledge about the statement's falsity or ignorance of its truth; (5) the speaker's intent that there be reliance; (6) the hearer's ignorance of the falsity of the statement; (7) reliance by the hearer; (8) the hearer's reliance was justifiable; and (9) resulting injury. *Frontier Dev. Grp., LLC v. Caravella*, 338 P.3d 1193, 1198 (Idaho 2014). At trial, the party alleging intentional misrepresentation or fraud has the burden of proving each of the aforementioned elements by clear and convincing evidence. *Lindberg v. Roseth*, 46 P.3d 518, 521 (Idaho 2002).

Mazak argues the Court should enter summary judgment on BME's fraud claim because BME has not established Mazak made any false representations. Dkt. 76-1, at 12–13. For instance, Mazak contends BME cannot show "Mazak and Gladwin misrepresented the ownership of the machine and concealed Gladwin's involvement with the machine"—as BME alleged in its Amended Complaint (Dkt. 15, ¶¶ 62, 65)—because it is purportedly undisputed BME "was told from the start that the FG-150 was owned by Gladwin's customer." Dkt. 76-1, at 12–13. BME does not dispute that it was aware the FG-150 was owned by HD, but argues it did not know Gladwin—as opposed to Mazak—was selling the FG-150 for HD. Reeve and Moffatt both maintain neither Young, nor anyone else at Mazak, ever explained either that Mazak was not selling the used FG-150, or that Mazak was only trying to broker a deal between Gladwin and BME. Dkt. 97-1, at 2; *see also* Dkt. 79-1, at 77:5–78:3.

Moreover, while Mazak implies Young told Reeve that Gladwin was selling the machine by maintaining "when Young found out that Gladwin was trying to sell a Used FG from HitchDoc, Young informed BME in mid-January of 2019" (Dkt. 76-2, ¶ 31), the January 23, 2019 email Mazak cites in support of this contention did not explain or even imply that: (1) Gladwin was selling the machine; (2) Mazak was not selling the machine; or (3) Mazak was not in involved with the sale. Dkt. 79-16. Instead, Young's email merely attached "the specifications for the machine we discussed" and explained the "[s]elling price would be $340,000 but will include Mazak preparing the machine for shipment, doing the re-installation at your facility and training." *Id*. As highlighted in the factual background section, various emails between Young, Bohlen, and Francis, as well as

portions of Francis's deposition testimony, suggest Mazak not only set the terms of the sale, but also sold the FG-150 to BME. Dkt. 116, Ex. A at 12, Ex. B at 16, Ex. E at 95:12–17; Dkt. 117, Ex. M at 27–28.

Next, Mazak argues BME cannot establish Mazak concealed Gladwin's involvement in the sale of the FG-150 because Gladwin's selling brochure (which had Gladwin's name on every page) constituted the "specifications" referenced in, and attached to, Young's January 23, 2019 email. Dkt. 76-1, at 13. Although Young attached Gladwin's specifications (which Mazak deems Gladwin's "offer" for the sale of the FG-150) to his email, Young did not suggest Gladwin was selling the machine, identify who Gladwin was, or even mention Gladwin at all. Dkt. 79-16; Dkt. 100, at 4. Nor did Young's email suggest the attached brochure included the terms for BME's purchase of the FG-150. *Id.* at 2. In fact, neither Young's email, nor the attached brochure, addressed sale terms already offered by Young, such as Mazak's agreement to apply BME's down payment for the VCL-T100 to BME's purchase of the FG-150. Dkt. 79-16, at 2, 4–6. Further, the Gladwin brochure attached to Young's email provided a different sale price ($299,000.00) than the $340,000.00 sale price Young offered, and BME ultimately accepted. Compare *id.* at 2 *with id.* at 4.[10]

Mazak also maintains it did not conceal Gladwin's involvement because Young connected Reeve with Francis so they could discuss the condition of the FG-150, Reeve spoke to Francis about the FG-150, and Gladwin issued both the Order Confirmation and

---

[10] BME paid $297,900.00, plus its prior down payment of $42,100.00, for a total of $340,000.00 for the FG-150. Dkt. 79-17.

invoice for the FG-150 to BME. Dkt. 76-1, at 13. However, Young testified that he didn't introduce Francis or give BME any information about who Francis was other than identifying Francis as Mazak's "distributor" in the Midwest. Dkt. 116, Ex. A at 114:15–116:14. Moffatt confirmed he didn't know who Gladwin was when Burton told Moffatt to change the PO from listing Mazak as the seller to identifying Gladwin as the seller. Dkt. 79-1, at 77:16–20. Further, Gladwin issued the Order Confirmation and invoice for the FG-150 more than two weeks *after* Mazak (through Burton) sent Moffatt a Financing Term Sheet on January 25, 2019, and advised Moffatt that financing had been approved for BME's purchase of the FG-150. Dkt. 82-9, ¶ 36. Moffatt testified that he signed and returned both BME's initial Purchase Order made out to Mazak, and the January 25, 2019 Financing Term Sheet,[11] to Burton and believed the transaction was complete once he did so. Dkt. 79-1, at 77:16–22. As a result, when Burton later asked Moffatt to change the Purchase Order to list Gladwin as the seller, Moffatt complied because he believed "the transaction was done" and that Young was either acting as an agent for Gladwin or Gladwin was an agent for Young and Mazak. *Id*. at 77:16–78:1.

Based on such facts and the parties' conflicting testimony, it is clearly disputed whether or not Mazak misrepresented Gladwin's involvement with the sale of the FG-150. As such, the Court cannot resolve the issue of whether Mazak concealed Gladwin's involvement in the sale of the FG-150 on summary judgment. *Zetwick v. Cnty. of Yolo*, 850

---

[11] BME maintains, and Mazak does not dispute, that the January 25, 2019 Financing Term Sheet contained "all the terms for the sale and financing" of BME's purchase of the FG-150. *Compare* Dkt. 82-9, ¶ 36 *with* Dkt. 93, at 6. As mentioned, Mazak—not Gladwin—sent BME the January 2019 Financing Term Sheet and set the $340,000.00 sales price for BME's purchase of the FG-150. *Id*.; *see also* Dkt. 79-16, at 2.

F.3d 436, 441 (9th Cir. 2017).

In addition, BME identifies multiple additional false statements Young allegedly made about the FG-150, and upon which BME relied when deciding to purchase the machine. For instance, Reeve filed a declaration attesting Young told him: (1) the FG-150 was a "tank" and the exact product BME needed; (2)  BME would be able to do anything and everything it needed to do with the FG-150 even though the machine was used; (3) BME would not have any issue the FG-150; (4) the FG-150 was up and running; and (5) the FG-150 would last for a long time. Dkt. 82-9, ¶ 30 (citing Dkt. 82-6). Although Young refutes that he made such statements in his own declaration (Dkt. 90-1, ¶¶ 23–27, 29) the Court cannot make credibility determinations with respect to Reeve and Young's conflicting testimony on summary judgment. *Zetwick*, 850 F.3d at 441.

Mazak also argues the Court should enter summary judgment on BME's fraud claim because BME conducted an independent investigation into the condition of the FG-150 prior to purchasing it. Dkt. 76-1, at 14 (citing *Faw v. Greenwood*, 613 P.2d 1338, 1340 (Idaho 1980)). Thus, although Mazak denies both that it sold the FG-150 to BME and that it made any representations to BME regarding the FG-150's condition, Mazak suggest BME's fraud claim still fails because BME was evidently satisfied with the FG-150's condition upon inspection.[12] *Id.*

---

[12] While, in its Motion for Summary Judgment, Mazak argues BME's fraud claim fails because BME conducted "an independent investigation into the condition" of the FG-150 prior to purchase (Dkt. 76-1, at 14), Mazak inconsistently maintains BME's breach of implied warranty claim is meritless because BME refused to inspect the machine. *Id.* at 8–9. On summary judgment, the Court also rejects Mazak's conflicting "inspection" argument with respect to BME's breach of implied warranty claim. Mazak cannot

(Continued)

While BME did, among other things, watch a FaceTime video from HD which allowed BME to view the FG-150 in real time, Mazak does not explain how BME could have known the FG-150 would not work for BME's purposes—or allegedly fail to function at all once it was "recommissioned"—through this viewing. As BME highlights, it did not have any experience with tube lasers prior to purchasing the FG-150, and relied upon Young's superior knowledge about the FG-150 in deciding to purchase it, particularly because Young visited BME's facility and purportedly made recommendations based upon BME's specific needs. Dkt. 82-6, ¶¶ 9, 20–22. Further, while in *Faw*, 613 P.2d at 1340, the Idaho Supreme Court held purchasers could not rely upon sellers' annual net income projection where the purchasers' independent examination of sellers' books revealed such projection was speculative, Idaho courts have specifically held an inspection of property, "by itself, does not preclude buyers from bringing an action for fraud." *Lindberg v. Roseth*, 46 P.3d 518, 524 (Idaho 2002). Instead, if "any latent defects that are not discoverable upon a reasonable inspection exist, the buyer who has made an inspection and did not discover such defects can still recover if the seller fraudulently failed to disclose or misrepresented the existence of such defects." *Id*. (citations omitted). Because Mazak does not point to any issues BME could have discovered through inspecting the FG-150, the Court rejects Mazak's contention that BME's fraud claim fails on summary judgment because BME "was evidently satisfied with the Used FG's condition prior to purchasing it." Dkt. 76-1, at 14.

---

simultaneously contend BME inspected the FG-150 (to refute BME's fraud claim) and that BME did not inspect the machine (to avoid BME's breach of implied warranty claim) and expect the Court to accept either contention as undisputed.

Although BME addresses each of the other elements of its fraud claim in its Response to Mazak's Motion for Summary Judgment, Mazak's Motion challenges only BME's ability to establish Mazak made false statements upon which BME relied. *Compare* Dkt. 76-1, at 12–15 *with* Dkt. 97, at 10–18. Because there are disputed issues of genuine material fact with respect to Mazak's allegedly false statements and BME's reliance, the Court finds BME's fraud claim must proceed to trial.

### D. Unjust Enrichment

There can be no recovery for unjust enrichment where there is an express contract covering the same subject matter. *Thomas v. Thomas*, 249 P.3d 829, 836 (Idaho 2011). This is because remedies for breach of an express contract, whether by law or by express agreement, afford adequate relief. *Triangle Min. Co., Inc. v. Stauffer Chem. Co.,* 753 F.2d 734, 742 (9th Cir.1985). This Court has held to establish a claim for unjust enrichment under Idaho law, a plaintiff must prove: (1) a benefit is conferred on the defendant by the plaintiff; (2) the defendant appreciates the benefit; and (3) it would be inequitable for the defendant to accept the benefit without payment of the value of the benefit. *Nelson-Ricks Cheese Company, Inc. v. Lakeview Cheese Company, LLC,* 331 F.Supp.3d 1131, 1145 (D. Idaho 2018).

BME argues it pleaded unjust enrichment as an alternative claim in case the Court or jury find BME did not have a contract with Mazak. Dkt. 97, at 19. Even if the Court were to so hold, or the jury to so find, there would still be a valid, express contract between BME and Gladwin for the FG-150. The Court has not located, and the parties have not cited, any cases holding a contract between two parties precludes an unjust enrichment

claim against a third party who is not part of the contract, but nevertheless benefited from it. If the jury determines the only contract is between BME and Gladwin, BME's settlement with Gladwin precludes any damages for breach of that contract. However, BME would still be entitled to damages from Mazak for any unjust enrichment Mazak received over and above the damages BME incurred as a result of Gladwin's breach. Therefore, the Court must deny Mazak's Motion for Summary Judgment as to BME's unjust enrichment claim.

### E.  Breach of Contract and Breach of Implied Warranty

BME's other two claims involve the existence or non-existence of the same material fact—whether or not Mazak sold the FG-150 to BME. Put another way, the bulk of this case, and both summary judgment motions, hinge on a contract to which Mazak is or is not a party. For this reason, both motions, regarding the contract and breach of implied warranty claims, will be discussed together.

Mazak goes to great lengths in its memorandum in support of summary judgment to  argue  the only contract was between BME and Gladwin.[13] In doing so, Mazak ignores that the facts it highlights create genuine issues of disputed material fact on the contract issue. For example, Mazak suggests it "never took part in any aspect of selling [HD's FG-150]—that was an arrangement between [HD] and Gladwin." Dkt. 76-2, ¶ 30. Yet, as described above, in 2019 Francis instead maintained:

"[BME] was Mazak's customer, not Gladwin's. *We did not sell them the*

---

[13] To prevail on a breach of contract claim, a plaintiff must establish the following elements: (1) the existence of the contract; (2) defendant's breach of that contract; (3) that the breach caused plaintiff damages; and (4) the amount of those damages. *Safaris Unlimited, LLC v. Von Jones*, 353 P.3d 1080, 1084 (Idaho 2015). Since both Motions for Summary Judgment focus on the first element of BME's breach of contract claim, and because the Court finds this element is genuinely disputed—the Court does not address the other three elements at this stage of the proceedings. Dkt. 76-1, at 6–8; Dkt. 82-1, at 11–14.

> *machine, Mazak did.* Because it was used, to get the new deal done, Mazak asked Gladwin to invoice the customer and collect the money. Mazak priced it at $340,000. . . . We did not represent, guaranty, *nor were we involved in the actual sale of the used machine* to [BME] This was all handled directly by Mazak[.]

Dkt. 117, Ex. M at 27–28 (emphasis added). Regardless of whether King or Francis wrote the aforementioned email, Francis forwarded it to one of Mazak's financing managers, and Bohlen, Mazak's President, confirmed the email was accurate. *Id*. Further, and as mentioned, while Mazak characterizes Gladwin's sales brochure as Gladwin's "offer" for the sale of the machine the BME, the sales brochure identified a different price than that set by Mazak in Young's email forwarding Gladwin's brochure. Dkt. 79-16, 2–4. That BME paid the sales price set by Mazak—and not the price identified in Gladwin's purported "offer," suggests Mazak set the terms of the sale to which BME ultimately agreed. Thus, despite its representations to the contrary on summary judgment, Mazak's role in the sale of the FG-150 is, at the very least, disputed.

Mazak also maintains there "is no dispute that the only contract in this matter is between Gladwin and [BME]." Dkt. 76-1, at 6. Again, this fact *is* disputed. As discussed above, while it is true the PO ultimately identified Gladwin as the seller, Moffatt testified he signed and returned both BME's initial Purchase Order made out to Mazak, and the Mazak's January 25, 2019 Financing Term Sheet—which purportedly contained all of the terms of the deal—to Burton and believed the transaction was complete once he did so. Dkt. 79-1, Ex. A at 77:16–22. When Burton subsequently asked Moffatt to change the Purchase Order to identify Gladwin as the seller, Moffatt explained he did not know who

Gladwin was,[14] and since Young and Burton had been handling the transaction, and he believed the transaction was already complete once he signed the financing information had previously sent him, he changed the PO because he believed Young was either acting as an agent for Gladwin or Gladwin was an agent for Young and Mazak.[15] *Id.* at 77:16–78:1.Thus, BME claims this was a classic bait-and-switch performed by Mazak against BME. BME's position seems credible given that *Gladwin* also appeared to believe Mazak sold the FG-150 to BME and that Gladwin merely handled the paperwork at the last minute and at Mazak's request. Dkt. 116, Ex. E at 70:24–72:4, 95:12–17; Dkt. 117, Ex. M at 27–28.

Finally, BME's breach of implied warranty claim also depends upon the disputed issue of whether or not Mazak sold BME the FG-150. Under Idaho law, "[u]nless excluded or modified, a warranty that goods will be fit for a buyer's particular purpose is implied in all sales *in which the seller*, at the time of contracting, has reason to know of that particular purpose and the buyer is relying on the seller's skill or judgment to select or furnish suitable

---

[14] In its Motion for Summary Judgment, Mazak misleadingly claims "Reeve was informed weeks before [January 20, 2019] that Gladwin was the seller of the Used FG." Dkt. 76-1, at 7 (citing Dkt. 76-2, ¶ 32). However, the paragraph from its Statement of Undisputed Facts Mazak cites in support of this contention instead contends Young never told BME that Mazak owned HD's used FG-150, and Young instead told Reeve that Gladwin's customer—HD—owned the FG-150. Dkt. 76-2, ¶ 32. While there is no dispute BME was aware the FG-150 belonged to HD, Mazak and BME clearly dispute whether BME was aware Gladwin, and not Mazak, was selling the FG-150 for HD.

[15] In its Motion for Summary Judgment, BME argues Mazak is liable for breach of contract because it acted as an agent for Gladwin, its undisclosed principal. Dkt. 82-1, at 17–19. Mazak disputes that it acted as a sales agent for Gladwin, and maintains it had no "direct power over Gladwin or the terms of the Contract, and therefore had no obligation to disclose the nature of its relationship with Gladwin." Dkt. 90, 11–12. As outlined herein, Mazak's role in the sale is disputed, and there is evidence to suggest Mazak not only facilitated the sale, but also controlled the terms of the sale and concealed Gladwin's involvement in the sale. The Court accordingly declines to further address the parties' competing arguments regarding agency on summary judgment. Instead, whether Mazak acted as Gladwin's agent—or vice versa—is an issue for trial.

goods." Idaho Code § 28-2-315 (emphasis added). As such, to sustain a claim for breach of implied warranty, there generally must be privity of contract between the seller and the purchaser. *Am. W. Enterprises, Inc., v. CNH, LLC*, 316 P.3d 662, 688 (Idaho 2013). Again, the role Mazak played in selling the FG-150 to BME, and whether Mazak contracted with BME, is disputed. The Court cannot determine whether Mazak is a seller under Idaho law, or if there was privity of contract between BME and Mazak, in light of these disputed facts. Although it seems clear that Mazak was an integral part of the sale of the FG-150, there are simply far too many factual disputes regarding the documents and representations included in the contract, the parties to the contract, and the terms of the contract to take these issues away from the jury. Any attempt by the Court to grant summary judgment on these issues would require the Court to impermissibly weigh the evidence. Thus, the Court denies both parties' Motions with respect to BME's breach of contract and breach of implied warranty claims.

## V. CONCLUSION

In light of the foregoing, Mazak's Motion for Summary Judgment is granted with respect to BME's Breach of Fiduciary Duty and Negligence claims, but denied as to BME's breach of contract, breach of implied warranty, fraud, and unjust enrichment claims. BME's Partial Motion for Summary Judgment is denied.

## VI. ORDER

Now, therefore**, IT IS HEREBY ORDERED:**

1. Mazak's Motion for Summary Judgment (Dkt. 76) is **GRANTED in part** and **DENIED in part**.

MEMORANDUM DECISION AND ORDER - 34

    a. Mazak's Motion for Summary Judgment is **GRANTED** with respect to BME's Breach of Fiduciary Duty and Negligence claims;

    b. Mazak's Motion for Summary Judgment is **DENIED** as to BME's Breach of Contract, Breach of Implied Warranty, Fraud, and Unjust Enrichment claims;

2. BME's Motion for Partial Summary Judgment (Dkt. 82) is **DENIED in its entirety**.

3. This matter will proceed to a jury trial on BME's Breach of Contract, Breach of Implied Warranty, Fraud, and Unjust Enrichment claims. On or before **May 30, 2025**, the parties shall JOINTLY email the Court's Law Clerk and identify the expected number of days required for trial. The Court's Law Clerk will subsequently contact the parties with available trial dates.

DATED: April 9, 2025

David C. Nye
Chief U.S. District Court Judge